UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JULIE A. MOTT,

              Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,[1]

              Defendant.

CASE NO. 12-cv-5380-RJB-JRC

REPORT AND
RECOMMENDATION ON
PLAINTIFF'S COMPLAINT

Noting Date: June 28, 2013

      This matter has been referred to United States Magistrate Judge J. Richard

Creatura pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR

4(a)(4), and as authorized by *Mathews, Secretary of  H.E.W. v. Weber*, 423 U.S. 261,

271-72 (1976).  This matter has been fully briefed (*see* ECF Nos. 12, 13, 14).

---

      [1] Carolyn W. Colvin became the Acting Commissioner of the Social Security
Administration on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

After considering and reviewing the record, the Court finds that the ALJ's findings regarding plaintiff's depression being controllable; that there was a lack of objective findings supporting her allegations of fibromyalgia; and that her fibromyalgia was treated conservatively, all are findings supported by substantial evidence in the record as a whole. However, after finding that plaintiff could not perform her past relevant work, the ALJ failed to recognize or resolve a conflict between the information in the Dictionary of Occupational Titles and the vocational expert's testimony regarding other jobs in the national economy that plaintiff could have performed. Because this error is not harmless, the ultimate determination regarding nondisability cannot stand.

Therefore, this matter should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further proceedings.

<u>BACKGROUND</u>

Plaintiff, JULIE A. MOTT, was born in August, 1959 and was thirty-eight years old on the amended alleged date of disability onset of February 27, 2002 (*see* Tr. 16, 32, 149). She completed eleventh grade, but did not obtain her high school diploma or G.E.D. (*see* Tr. 37).

Plaintiff had at least the severe impairments of seizure disorder; alcoholism; fibromyalgia; and depression (*see* Tr. 18). She has past relevant work as a bartender; bartender helper; cashier; janitor; floral designer; and salesperson (*see* Tr. 22). At the time of her administrative hearing, plaintiff testified that she lived in a house with her husband, who had been on disability for two years at the time of the hearing (Tr. 36).

1

## PROCEDURAL HISTORY

2

On April 15, 2008, plaintiff filed an application for disability insurance benefits

3

("DIB") pursuant to 42 U.S.C. § 423 (Title II) of the Social Security Act (*see* Tr. 16, 149-

4

56). The application was denied initially and following reconsideration (*see* Tr. 78-80,

5

82-83). Plaintiff's requested hearing was held before Administrative Law Judge Ruperta

6

M. Alexis ("the ALJ") on November 30, 2010 (*see* Tr. 28-75). On January 7, 2011, the

7

ALJ issued a written decision in which the ALJ concluded that plaintiff was not disabled

8

pursuant to the Social Security Act (*see* Tr. 13-27).

9

On February 22, 2012, the Appeals Council denied plaintiff's request for review,

10

making the written decision by the ALJ the final agency decision subject to judicial

11

12

review (Tr. 1-6). *See* 20 C.F.R. § 404.981. Plaintiff filed a complaint in this Court

13

seeking judicial review of the ALJ's written decision on April 27, 2012 (*see* ECF No. 1).

14

Defendant filed the sealed administrative record regarding this matter ("Tr.") on

15

September 24, 2012 (*see* ECF Nos. 7, 8). In plaintiff's Opening Brief, plaintiff raises the

16

following issues:   (1) whether or not the ALJ erred in her review of the medical

17

evidence; (2) whether or not the ALJ erred in her review of plaintiff's testimony; (3)

18

19

whether or not the ALJ erred in her review of plaintiff's residual functional capacity

20

("RFC"); and (4) whether or not the ALJ erred at step five by relying on an improper

21

RFC that did not include all of plaintiff's limitations and by relying on vocational expert

22

testimony allegedly in conflict with the Dictionary of Occupational Titles ("DOT") (*see*

23

ECF No. 12, pp. 2-3).

24

1

## STANDARD OF REVIEW

2

Plaintiff bears the burden of proving disability within the meaning of the Social

3

Security Act (hereinafter "the Act"); although the burden shifts to the Commissioner on

4

the fifth and final step of the sequential disability evaluation process. *Meanel v. Apfel*,

5

172 F.3d 1111, 1113 (9th Cir. 1999); *see also Johnson v. Shalala*, 60 F.3d 1428, 1432

6

(9th Cir. 1995); *Bowen v. Yuckert*, 482 U.S. 137, 140, 146 n.5 (1987). The Act defines

7

disability as the "inability to engage in any substantial gainful activity" due to a physical

8

or mental impairment "which can be expected to result in death or which has lasted, or

9

can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

10

§§ 423(d)(1)(A), 1382c(a)(3)(A).  Plaintiff is disabled pursuant to the Act only if

11

plaintiff's impairments are of such severity that plaintiff is unable to do previous work,

12

and cannot, considering the plaintiff's age, education, and work experience, engage in

13

any other substantial gainful activity existing in the national economy. 42 U.S.C. §§

14

423(d)(2)(A), 1382c(a)(3)(B); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir.

15

1999).

16

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's

17

denial of social security benefits if the ALJ's findings are based on legal error or not

18

supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d

19

1211, 1214 n.1 (9th Cir. 2005) (*citing Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

20

1999)). "Substantial evidence" is more than a scintilla, less than a preponderance, and is

21

such "'relevant evidence as a reasonable mind might accept as adequate to support a

22

conclusion.'" *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (*quoting Davis v.*

23

24

*Heckler*, 868 F.2d 323, 325-26 (9th Cir. 1989)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). Regarding the question of whether or not substantial evidence supports the findings by the ALJ, the Court should "'review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" *Sandgathe v. Chater*, 108 F.3d 978, 980 (1996) (per curiam) (*quoting Andrews, supra*, 53 F.3d at 1039). In addition, the Court must independently determine whether or not "'the Commissioner's decision is (1) free of legal error and (2) is supported by substantial evidence.'" *See Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2006) (*citing Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

According to the Ninth Circuit, "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ - - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1226-27 (9th Cir. 2009) (*citing SEC v. Chenery Corp*., 332 U.S. 194, 196 (1947) (other citation omitted)); *see also Molina v. Astrue*, 674 F.3d 1104, 1121, 2012 U.S. App. LEXIS 6570 at *42 (9th Cir. 2012); *Stout v. Commissioner of Soc. Sec.*, 454 F.3d 1050, 1054 (9th Cir. 2006) ("we cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision") (citations omitted). In the context of social security appeals, legal errors committed by the ALJ may be considered harmless where the error is irrelevant to the ultimate disability conclusion when considering the record as a whole. *Molina, supra*, 674 F.3d 1104, 2012 U.S. App. LEXIS 6570 at *24-*26, *32-*36, *45-

*46; *see also* 28 U.S.C. § 2111; *Shinsheki v. Sanders*, 556 U.S. 396, 407 (2009); *Stout, supra*, 454 F.3d at 1054-55.

<u>DISCUSSION</u>

1. **Whether or not the ALJ erred in her review of the medical evidence**.

"A treating physician's medical opinion as to the nature and severity of an individual's impairment must be given controlling weight if that opinion is well-supported and not inconsistent with the other substantial evidence in the case record." *Edlund v. Massanari*, 2001 Cal. Daily Op. Srvc. 6849, 2001 U.S. App. LEXIS 17960 at *14 (9th Cir. 2001) (*citing* SSR 96-2p, 1996 SSR LEXIS 9); *see also* 20 C.F.R. § 416.902.

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician or psychologist. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (*citing Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990)). Even if a treating or examining physician's opinion is contradicted, that opinion can be rejected only "for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester, supra*, 81 F.3d at 830-31 (*citing Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995)).

a. <u>Fibromyalgia</u>

Plaintiff contends that her impairment of fibromyalgia was not assessed properly by the ALJ and contends that the ALJ required objective medical evidence for an impairment that does not have an objective medical test. Although it is improper in some

1   instances for an ALJ to fail to credit medical opinions regarding a claimant's limitations

2   resulting from multiple diagnoses of fibromyalgia, this record herein regarding plaintiff's

3   fibromyalgia is distinguishable. Here, it is not the ALJ who has made the initial

4   determination regarding a lack of objective findings to support a diagnosis of

5   fibromyalgia, but plaintiff's examining rheumatological physician who opined as such.

6   Similarly, here the ALJ has not characterized plaintiff's treatment as conservative

7   independently of the doctors' opinions, but plaintiff's own doctor opined that only

8   conservative treatment was warranted for plaintiff's condition . Plaintiff's reliance on

9   case law in which a different ALJ discredited multiple doctors' opinions, and in which

10  the ALJ had come to the independent conclusion that a claimant's treatment was

11  conservative, is not persuasive, as this case is distinguishable. *See Benecke v. Barnhart*,

12  379 F.3d 587, 594 (9th Cir. 2004).

13

14          In this matter, examining doctor, Dr. Mark W. Layton, M.D., provided the

15  following opinion on March 8, 2002:

16          Thank you for asking [plaintiff] to see me for a rheumatological
            consultation. I have enclosed a copy of my February 27 office note for
17          your records.

18          It is my impression that [plaintiff] suffers from diffuse myalgias and
            arthralgias which I am unable to attribute to a specific underlying
19          systemic rheumatic disease. Her rheumatologic examination was benign.
            Laboratory data revealed a normal CBC, an erythrocyte sedimentation
20          rate of 21, SGPT 26, negative ANA and a negative rheumatoid factor.
            Since [plaintiff] experienced minor improvement through a trial of
21          Lodine I have recommended that additional agents be used. She will try
            using diclofenac 75 mg b.i.d. in place of Lodine. I have also
22          recommended that she try taking Flexeril 10 mg at bedtime in order to
            improve her sleep hygiene. I look forward to seeing [plaintiff] after a one
23          month interval to assess the course of her symptoms. Diagnoses under

24

1
2
3

consideration include polymyalgia rheumatic, fibromyalgia and the subtle emergence of an undifferentiated connective tissue disease. At this point, the absence of significant objective findings suggest that continued conservative medication trials is appropriate.

4

(Tr. 382).

5

Regarding plaintiff's fibromyalgia, the ALJ included the following discussion in

6

her written opinion:

7
8
9
10
11
12
13
14

In terms of the claimant's fibromyalgia the medical records do not indicate that the claimant's pain is as intense as she alleges prior to her date last insured. The records from the claimant's treating doctor show lack of significant objective findings but was being treated conservatively for her symptoms (internal citation to Exhibit 4F/3.). On examination, the claimant showed full range of motion throughout the cervical spine, normal thoracolumbar vertebral alignment, an[d] full range of motion at both shoulders. The lower extremity examination revealed a full range of motion at the hips and knees. It was also noted that the claimant's gait was smooth and symmetric (internal citation to Exhibit 4F/4). The claimant had x-rays and an MRI that did not indicate any cause for the intense pain the claimant is alleging (internal citation to Exhibit 10F). There is nothing in the record to indicate the reason for the claimant's intense pain prior to the date last insured.

15
16
17

. . . .

As for the opinion evidence, the claimant's treating doctor opined that the claimant suffers from diffuse myalgias and arthralgias, which could not be attributed to a specific underlying systemic rheumatic disease (internal citation to Exhibit 4F/3).

18

(Tr. 21).

19

Here, when finding that plaintiff's record was lacking in significant objective

20

medical findings or evidence to support her allegations during the relevant period of

21

alleged disability, and when finding that plaintiff's treatment was conservative, the ALJ

22

appears to be crediting plaintiff's examining rheumatology specialist (*see* Tr. 382).

23

Although plaintiff contends that prior to her date last insured, Dr. Layton diagnosed

24

1  plaintiff with possible polymyalgia rheumatic or fibromyalgia, citing the above quoted

2  opinion from Dr. Layton, the Court does not agree (*see* Opening Brief, ECF No. 12, p. 14

3  (*citing* Tr. 382, 481)). Dr. Layton did not diagnose plaintiff with any particular

4  impairment, but indicated that her examination was benign, that there was a lack of

5  significant objective evidence supporting her complaints of pain, and that he was

6  considering potential diagnoses. This interpretation is buttressed by the fact that the

7  opinion regarding potential diagnoses is followed by a sentence regarding the lack of

8  significant objective findings to substantiate a diagnosis and is preceded by a sentence

9  regarding Dr. Layton's interest in a follow up appointment "after a one month interval to

10  assess the course of her symptoms" (*see* Tr. 382).

12          More importantly, the ALJ's overall interpretation of the evidence and record and

13  her finding that Dr. Layton had not diagnosed plaintiff with fibromyalgia at this time is

14  supported by substantial evidence in the record as a whole. Although it may be true that a

15  different interpretation of the evidence also may be gleaned from the evidence of record,

16  according to the Ninth Circuit, if the evidence "is susceptible to more than one rational

17  interpretation," including one that supports the decision of the Commissioner, the

18  Commissioner's conclusion "must be upheld." *See Thomas v. Barnhart*, 278 F.3d 947,

19  954 (9th Cir. 2002) (*citing Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599,

20  601 (9th Cir. 1999)).

22          Plaintiff also argues similarly that Dr. Colette M. Kato, D.O. diagnosed Mott with

23  possible polymyalgia rheumatic or fibromyalgia prior to plaintiff's date last insured (*see*

24  Opening Brief, ECF No. 12, p. 14 (*citing* Tr. 382, 481)). However, the only diagnoses on

1  the pages cited are myalgias; arthralgias; and weight gain (*see* Tr. 382, 481). These

2  diagnoses were provided by Dr. Kato on March 18, 2002, during the alleged period of

3  disability (*see* Tr. 481).

4        For the stated reasons and based on the relevant record, the Court concludes that

5  the ALJ's finding that plaintiff's "treating doctor opined that the claimant suffers from

6  diffuse myalgias and arthralgias, which could not be attributed to a specific underlying

7  systemic rheumatic disease" is a finding supported by substantial evidence in the record

8  as a whole (*see* Tr. 21, 481). Although plaintiff faults the ALJ for "failing to

9  acknowledge that fibromyalgia is an impairment that does not have objective findings

10  other than tender points," the Court notes that rheumatology specialist, Dr. Layton,

11  observed that no tenderness was present in the MTP and PIP joints, nor in the

12  trochanteric bursae (*see* Tr. 383). He also noted multiple areas of normal range of motion;

13  a lack of "synovitis, deformity, erythema or diminished range of motion at the wrists,

14  MCP, PIP and DIP joints;" and no effusions at the knees or ankles (*see id.*). Dr. Layton

15  diagnosed plaintiff with "myalgias/arthralgias of unclear etiology" (*see id.*).

16

17        As mentioned previously, this matter before the Court clearly is distinguishable

18  from the case relied on by plaintiff, *Benecke*, which was a case in which "[e]very

19  rheumatologist who treated Benecke (Doctors Harris, Pace, and Gluck) diagnosed her

20  with fibromyalgia." *See Benecke, supra*, 379 F.3d at 594 ("the ALJ erred in discounting

21  the opinions of Benecke's treating physicians, relying on his disbelief of Benecke's

22  symptoms testimony as well as his misunderstanding of fibromyalgia") (footnote

23  omitted). In *Benecke*, the Ninth Circuit credited the physician's opinions as true, because

24

the court found that the ALJ had failed to provide legally sufficient reasons for rejecting Benecke's treating physician's opinions, whereas here, the ALJ credited the rheumatologist's opinion regarding a lack of significant objective findings to support a diagnosis of fibromyalgia. *See id.* (citations omitted); (*see also* Tr. 21, 382).

Although plaintiff finds error in the ALJ's evaluation of the medical opinions of Drs. Layton and Kato, plaintiff does not point to any specific opinion by these doctors that was rejected by the ALJ and does not direct the Court to any opinion regarding a specific functional limitation suffered by plaintiff that was not accommodated in the ALJ's determination regarding her residual functional capacity ("RFC").

b. <u>Seizures</u>

Similarly, plaintiff complains about the ALJ's statement that "In terms of the claimant's seizures the objective medical evidence does not support the claimant's allegations that they keep her from working," and argues that "this is not a valid reason to discredit Dr. Kato's opinion that [plaintiff] was having seizures" (*see* Opening Brief, ECF No. 12, p. 13). However, the ALJ does not appear to have discredited Dr. Kato's opinion that plaintiff was having seizures. In fact, to the contrary, the ALJ found that plaintiff had a severe impairment of seizure disorder (*see* Tr. 18).

The ALJ included the following discussion regarding plaintiff's seizures:

> In terms of the claimant's seizures the objective medical evidence does not support the claimant's allegations that they keep her from working. The CT scan showed no hemorrhage or mass effect with minimal swelling in the right maxillary sinus (internal citation to Exhibit 10F/2). Further, the record indicates that the claimant was drinking during this time, which may or may not have caused the seizure. The claimant continued to drink.

. . . .

The medical expert testified at the hearing . . . . that the claimant had complaints of seizures but the only treatment was taking antidepressants. The medical expert also opined that the seizures were related to alcohol because large blood cells were indicated in the record, which is frequently seen in patients drinking excessive alcohol. In making his opinion, the medical expert also considered that the claimant was not receiving treatment for seizures prior to date last insured. Further, the abnormalities seen in the brain scan is most likely related to alcoholism. However, due to these seizures the medical expert testified that to avoid injury the claimant should not climb height or work around machinery.

(Tr. 21).

The ALJ gave significant weight to the medical expert's opinion; found that it was based on the objective medical evidence; and added the restriction to climbing and operating dangerous machinery or equipment into plaintiff's residual functional capacity ("RFC") (*see* Tr. 20, 22). The ALJ found that plaintiff's seizure disorder did not prevent her from working, and plaintiff has offered only her testimony, which the ALJ did not credit fully, *see supra*, section 2, in her attempt to demonstrate that her seizures had any additional effect on her ability to work. Plaintiff has not demonstrated that her seizures affected her ability to maintain regular attendance at a job. The Court concludes that the ALJ's findings regarding plaintiff's seizures are supported by substantial evidence in the record as a whole.

c. Depression

The ALJ made a number of findings regarding plaintiff's depression, including that it was under control prior to plaintiff's date last insured; that plaintiff was prescribed Prozac by her treating doctor and that it was controlling her depression; that plaintiff stopped taking Prozac on her own; and that the subsequent year plaintiff stated that

Prozac was helping her (*see* Tr. 21). Although plaintiff complains that the ALJ's findings are not supported by the record, the only finding listed that may not be correct technically is the finding that in the subsequent year to ceasing her Prozac, plaintiff stated that it was helping her. As pointed out by plaintiff, plaintiff "did not state that Prozac was helping her; she told Dr. Kato that it had helped her in the past" (*see* Opening Brief, ECF No. 12, p. 12). As the record provides substantial support for the ALJ's findings that Prozac had helped plaintiff, both before and after the date last insured; and, as the record provides substantial support for the ALJ's finding that plaintiff's depression was under control during the alleged period of disability, this potential technical error is harmless and not relevant to the ultimate determination regarding disability in this matter based on the record as a whole. *See Molina*, *supra*, 674 F.3d at 1115.

Plaintiff argues that "Dr. Kato actually wrote that although Prozac was controlling [plaintiff's] depression, [plaintiff] had been 'feeling very fatigued and tired since starting the Prozac'" (*id.* (*citing* Tr. 462-63)). Plaintiff complains that her depression was not fully under control (*id.* at p. 14).

On January 10, 2001, about a year prior to her date of alleged disability onset, plaintiff went to her treating doctor, Dr. Kato (*see* Tr. 462). At that time, she indicated that she was feeling very tired and fatigued since she started taking Prozac, however, she also indicated that it was working well for her depression (*see id.*). Dr. Kato indicated that she would have plaintiff take her Prozac in the evening, instead of in the morning, and Dr. Kato diagnosed plaintiff with "Depression well controlled with Prozac however symptomatic" (*see id.*). One week later, Dr. Kato's notes reveal that plaintiff "has

1 stopped the Prozac" (*see* Tr. 463). Dr. Kato's notes do not indicate that plaintiff was

2 suffering any depression at that subsequent appointment, in fact, she indicated that

3 plaintiff was "actually feeling much better today" (*see id.*). Dr. Kato did not assess that

4 plaintiff was suffering from depression at this January 17, 2001 examination (*see id.*).

5 She indicated that she reviewed plaintiff's medications with her and would not make any

6 changes (*see id.*).

7       In March, 2002, during the alleged period of disability, Dr. Kato did not note any

8 issues with depression in plaintiff's record, and did not diagnose plaintiff with depression

9 (*see* Tr. 481). On May 22, 2002, plaintiff indicated that she was having situational issues

10 in that she was "having difficulty dealing with a grandchild in a daycare situation" (*see*

11 Tr. 482). Although plaintiff requested "something for 'her nerves,'" Dr. Kato discussed

12 with plaintiff "the need to add something such as Celexa as opposed to a tranquilizer"

13 (*see id.*). The Court also notes that plaintiff reported feeling less pain, *i.e.*, less

14 arthralgias, when she had less weight, and that indicated to Dr. Kato that she wanted to

15 "do a diet pill" (*see id.*). Dr. Kato did not recommend such medication. Dr. Kato

16 diagnosed plaintiff with depression and prescribed Celexa (*see id.*). On June 12, 2002,

17 plaintiff indicated that Celexa was not helping her depression, and Dr. Kato advised

18 increasing the dose (*see* Tr. 483). On August 12, 2002, plaintiff indicated that she

19 suffered a rash since taking the Celexa, and Dr. Kato advised tapering and ending the

20 Celexa, and adding an alternative such as Zoloft subsequently (*see* Tr. 484). On

21 September 13, 2002, plaintiff indicated that she was "doing better on the Zoloft" (*see* Tr.

22 486). Dr. Kato indicated that "Depression seems to be as good as it was on Celexa. She

23

24

REPORT AND RECOMMENDATION ON
PLAINTIFF'S COMPLAINT - 14

feels as though she could get better relief however" (*see id.*). Dr. Kato advised increasing the Zoloft dosage (*see id.*).

On September 13, 2002, plaintiff indicated that she was "doing better on the Zoloft" (*see* Tr. 486). On October 28, 2002, Dr. Kato did not diagnose plaintiff with depression (*see* Tr. 490). On December 11, 2002, plaintiff reported that she ceased her Zoloft for a couple of days, and did not notice any difference when off of it (*see* Tr. 491). Dr. Kato's notes indicate as follows: plaintiff, "after some discussion, found that Prozac worked well a long time ago. We will restart that" (*see id.*). At plaintiff's December 27, 2002 follow up appointment, depression was not discussed and was not diagnosed as a current impairment, and Prozac is not listed as a medication (*see* Tr. 494). However, Prozac is listed as a current medication in January, 2003, although depression still is not diagnosed as an impairment in January, 2003, just after plaintiff's date last insured (*see* Tr. 495).

Although subsequent to her date last insured, plaintiff appears to have been on Prozac on April 29, 2003, and Dr. Kato observed that plaintiff demonstrated normal mood and affect, not a depressed affect (*see* Tr. 496-97). Similarly, on September 2, 2003, and on October 15, 2003, Dr. Kato indicated that plaintiff was on Prozac and was demonstrating normal mood and affect (*see* Tr. 499-501, 506-07). Although these treatment records from 2003 are after plaintiff's date last insured, and although the ALJ did not include an exhaustive discussion of the aforementioned evidence, such evidence helps to demonstrate that the ALJ's finding that Prozac controlled plaintiff's depression is supported by the record as a whole.

As just outlined, the record reveals that for some of the relevant period of alleged disability -- from February 27, 2002 through December 31, 2002 -- plaintiff reported having situational issues in that she was "having difficulty dealing with a grandchild in a daycare situation" and requested "something for 'her nerves,'" (*see* Tr. 482; *see also* Tr. 23). Plaintiff tried Celexa, which perhaps created side effects; then plaintiff tried Zoloft; then, plaintiff ceased her Zoloft depression medication and indicated that Prozac had worked well for her a long time prior (*see* Tr. 490). Plaintiff subsequently started taking Prozac and had multiple subsequent visits to the doctor in which depression is not mentioned or diagnosed as a current impairment, including plaintiff's December 27, 2002 follow up appointment and her January 15, 2003 appointment shortly thereafter (Tr. 494; *see also* Tr. 495).

Therefore, although the record demonstrates that plaintiff suffered situational issues causing her depression during the relevant period of alleged disability, the record also demonstrates that on some occasions during her alleged period of disability, plaintiff did not indicate to her treating doctor that she was suffering from depression and plaintiff was not diagnosed with depression, such as in March, 2002 (*see* Tr. 481); October, 2002 (*see* Tr. 490); and December 27, 2002 (Tr. 494).

For the reasons discussed and based on the relevant record, the Court concludes that the ALJ's findings that plaintiff's depression was under control prior to plaintiff's date last insured; that plaintiff was prescribed Prozac by her treating doctor and that it was controlling her depression; that plaintiff stopped taking Prozac on her own, are findings supported by substantial evidence in the record as a whole (*see* Tr. 21; *see also*

463). Although in the year after plaintiff stopped taking Prozac, plaintiff stated that Prozac had worked well a long time ago and not that it had been helping her at that time, this appears to be a harmless error (*see* Tr. 491). Even if the ALJ hypothetically did find that plaintiff reported that Prozac was helping her during her period of alleged disability, instead of having found that plaintiff reported that it had been helping her previously, the Court still finds no harmful error. This is demonstrated by plaintiff's reply.

In reply to defendant's argument that based on the record, the ALJ reasonably could infer that plaintiff's depression was treated successfully with antidepressants, plaintiff replies that "But based upon this record, the ALJ could also reasonably infer that [plaintiff] experienced adverse side effects from every antidepressant medication she was prescribed, and that she would then stop taking the medication and seek other medication" (*see* Reply, ECF No. 14, p. 2). The Court agrees: the ALJ reasonably inferred based on the record that plaintiff's depression was treated successfully with antidepressants, and the ALJ also reasonably could have inferred based on the record that she experienced adverse side effects from every medication she took. Again, according to the Ninth Circuit, if the evidence "is susceptible to more than one rational interpretation," including one that supports the decision of the Commissioner, the Commissioner's conclusion "must be upheld." *See Thomas*, *supra*, 278 F.3d at 954 (*citing Morgan* , *supra*, 169 F.3d at 599, 601). Although the ALJ failed to discuss the particulars of plaintiff's side effects from her antidepressant medication, as the dispositive findings of the ALJ regarding plaintiff's depression being controlled by Prozac in general, and being controlled during the alleged period of disability both are supported by substantial

evidence in the record overall, the Court finds that the ALJ's error in failing to provide a

detailed discussion and acknowledgement of plaintiff's side effects is a harmless error.

The Ninth Circuit has "recognized that harmless error principles apply in the

Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). The

Court noted multiple instances of the application of these principles. *Id.* (collecting

cases). The court noted that "several of our cases have held that an ALJ's error was

harmless where the ALJ provided one or more invalid reasons for disbelieving a

claimant's testimony, but also provided valid reasons that were supported by the record."

*Id.* (citations omitted). The Ninth Circuit noted that "in each case we look at the record as

a whole to determine [if] the error alters the outcome of the case." *Id.* The court also

noted that the Ninth Circuit has "adhered to the general principle that an ALJ's error is

harmless where it is 'inconsequential to the ultimate nondisability determination.'" *Id.*

(*quoting Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008))

(other citations omitted). The court noted the necessity to follow the rule that courts

should review cases "'without regard to errors' that do not affect the parties' 'substantial

rights.'" *Id.* (*quoting Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (*quoting* 28 U.S.C.

§ 2111) (codification of the harmless error rule)).

Here, for the reasons discussed and based on the relevant record, the Court

concludes that any error in the ALJ's discussion of plaintiff's depression "is

'inconsequential to the ultimate nondisability determination.'" *Molina*, *supra*, 674 F.3d at

1115 (*quoting Carmickle*, *supra*, 533 F.3d at 1162) (other citations omitted).

d.  Medical expert's opinion

Plaintiff also complains regarding the ALJ's treatment of the medical expert's opinion, which was provided at plaintiff's administrative hearing. Regarding this opinion, the ALJ included the following discussion, in addition to the discussion of the medical expert's testimony regarding seizures already discussed above, *see supra*, section 1.b:

> The medical expert testified at the hearing that after considering all the claimant's impairments and symptoms there are no organic problems in her joints but he opined that she may have fibromyalgia, but there is no specific diagnosis of that.
>   .  .  .  .
> The undersigned [ALJ] gave significant weight to the medical expert's testimony in determining the claimant's residual functional capacity as it is based on the objective medical evidence of record. It was also noted that the claimant's treating doctor's (sic) had not diagnosed the claimant with fibromyalgia prior to the date last insured and it appeared from the doctors' notes that the claimant's depression was under control during this time. (internal citation to Exhibits 4F and 12F).

(Tr. 22).

Plaintiff complains that "it does not appear that [the ALJ] fully took into account his opinion that [plaintiff] had limitations due to her fibromyalgia, depression, and medication side effects," however, plaintiff fails to point to any specific additional functional limitation that should have been incorporated into her RFC (*see* Opening Brief, ECF No. 12, p. 14). Defendant contends that all of plaintiff's limitations supported by the record are included in her RFC, which the ALJ determined as follows:

> [T]hrough the date last insured, the claimant had the residual functional capacity [RFC] to perform a range of light work as defined in 20 CFR 404.1567(b). The work would be limited to occasionally and frequently lifting and carrying no more than ten pounds, sit six hours out of an eight hour day, stand/walk two hours out of an eight hour day. The claimant would be further limited to no climbing or ropes, ladders, or scaffolding;

1

2

no operation of dangerous machinery of equipment; work occasionally
one-third of the work day with the public; and follow simple repetitive
routines and work activities.

3

(Tr. 20).

4

      Plaintiff admits that the medical expert's testimony regarding that plaintiff may

5

have had possible limitations from the makeshift diagnosis of fibromyalgia and may have

6

had limitations due to her depression and the side effects of her medications was

7

"admittedly vague" (*see* Reply, ECF No. 14, p. 6; *see also* Tr. 62, 64-65). The Court also

8

notes that the ALJ's findings that plaintiff's rheumatological specialist had opined that

9

there was a lack of objective medical evidence to substantiate any diagnosis and had

10

opined that only conservative treatment was warranted was supported by substantial

11

evidence. For these reasons, and based on the relevant record, the Court concludes that

12

the admittedly vague statement by the medical expert that plaintiff had "possible

13

limitations because of the makeshift fibromyalgia" does not demonstrate any error in the

14

ALJ's findings regarding plaintiff's limitations resulting from her fibromyalgia in her

15

RFC (*see* Tr. 62). Plaintiff has not demonstrated any further limitation that should have

16

been included into her RFC, instead, plaintiff contends that the ALJ also was "required to

17

take into account [plaintiff]'s testimony about her symptoms and limitations" (*see* Reply,

18

ECF No. 14, p. 6). However, for the reasons discussed further below, *see infra*, section 2,

19

the ALJ did not err in failing to credit fully plaintiff's allegations regarding her symptoms

20

and limitations.

21

22

      Although plaintiff argues that the ALJ failed to credit fully the opinions of Drs.

23

Layton and Kato "that [plaintiff] was experiencing significant joint paint and depression,"

24

the Court notes that the doctors did not opine as such, they instead noted plaintiff's

complaints of pain and depression. The Court already has noted that during plaintiff's

alleged period of disability, on numerous occasions plaintiff failed to complain of

depressive symptoms when visiting her treating physician, *see supra*, section 1.c. The

Court also already has found that the ALJ's assessment of plaintiff's depression was

proper, *see supra*, section 1.c. Defendant persuasively contends that the ALJ

accommodated for plaintiff's limitations from depression into her RFC, including

limitations to working only occasionally one-third of the work day with the public, and

limitations to follow simple repetitive routines and work activities (Tr. 20). The vague

testimony of the medical expert regarding possible limitation from depression and side

effects of medication does not demonstrate that any further limitation is warranted in

plaintiff's RFC.

　　　　For the reasons discussed and based on the relevant record, the Court concludes

that the ALJ did not err in her analysis of the medical expert's testimony. The Court also

concludes that the ALJ did not commit harmful legal error in her evaluation of the

medical evidence.


　　2.　**Whether or not the ALJ erred in her review of plaintiff's testimony**.

　　　　If the medical evidence in the record is not conclusive, sole responsibility for

resolving conflicting testimony and questions of credibility lies with the ALJ. *Sample v.

Schweiker*, 694 F.2d 639, 642 (9th Cir. 1999); *Waters v. Gardner*, 452 F.2d 855, 858 n.7

(9th Cir. 1971); (*Calhoun v. Bailar*, 626 F.2d 145, 150 (9th Cir. 1980)). An ALJ is not

"required to believe every allegation of disabling pain" or other non-exertional

impairment.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (*citing* 42 U.S.C. §

423(d)(5)(A)). Even if a claimant "has an ailment reasonably expected to produce *some*

pain; many medical conditions produce pain not severe enough to preclude gainful

employment." *Fair, supra*, 885 F.2d at 603. The ALJ may "draw inferences logically

flowing from the evidence."  *Sample, supra*, 694 F.2d at 642 (*citing Beane v. Richardson*,

457 F.2d 758 (9th Cir. 1972); *Wade v. Harris*, 509 F. Supp. 19, 20 (N.D. Cal. 1980)).

Nevertheless, the ALJ's credibility determinations "must be supported by specific,

cogent reasons." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citation omitted).

In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "'must

specifically identify what testimony is credible and what evidence undermines the

claimant's complaints.'"  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (*quoting

Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)); *Reddick,

supra*, 157 F.3d at 722 (citations omitted); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th

Cir. 1996) (citations omitted). The ALJ may consider "ordinary techniques of credibility

evaluation," including the claimant's reputation for truthfulness and inconsistencies in

testimony, and may also consider a claimant's daily activities, and "unexplained or

inadequately explained failure to seek treatment or to follow a prescribed course of

treatment." *Smolen, supra*, 80 F.3d at 1284.

The determination of whether or not to accept a claimant's testimony regarding

subjective symptoms requires a two-step analysis.  20 C.F.R. §§ 404.1529, 416.929;

*Smolen, supra*, 80 F.3d at 1281 (*citing Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986)).

1  First, the ALJ must determine whether or not there is a medically determinable

2  impairment that reasonably could be expected to cause the claimant's symptoms. 20

3  C.F.R. §§ 404.1529(b), 416.929(b); *Smolen, supra*, 80 F.3d at 1281-82.  Once a claimant

4  produces medical evidence of an underlying impairment, the ALJ may not discredit the

5  claimant's testimony as to the severity of symptoms "based solely on a lack of objective

6  medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*,

7  947 F.2d 341, 343, 346-47 (9th Cir. 1991) (*en banc*) (*citing Cotton, supra*, 799 F.2d at

8  1407).  Absent affirmative evidence that the claimant is malingering, the ALJ must

9  provide specific "clear and convincing" reasons for rejecting the claimant's testimony.

10  *Smolen, supra*, 80 F.3d at 1283-84; *Reddick, supra*, 157 F.3d at 722 (*citing Lester v.*

11  *Chater*, 81 F.3d 821, 834 (9th Cir. 1996); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th

12  Cir. 1989)).

13

14          An ALJ may consider properly a claimant's failure to comply with prescribed

15  treatment, as such failure calls into question the severity of the claimant's symptoms and

16  may suggest that the claimant is not suffering from that severe of an impairment if not

17  doing everything possible to remedy it. *See* 20 C.F.R. § 404.1530 ("If you do not follow

18  the prescribed treatment without a good reason, we will not find you disabled"); *see also*

19  SSR 96-7 1996 SSR LEXIS 4, at *21-*22 ("the individual's statements may be less

20  credible if the level or frequency of treatment is inconsistent with the level of complaints

21  . . . .  and there are no good reasons for this failure"); *but see Nichols v. Califano*, 556

22  F.2d 931, 932 (9th Cir. 1977). However, a good reason can provide a valid excuse for not

23  following prescribed treatment, such as that a treating family physician does not

24

REPORT AND RECOMMENDATION ON
PLAINTIFF'S COMPLAINT - 23

recommend the treatment, or that it is excessively painful or dangerous. 20 C.F.R. §

404.1530; SSR 96-7 1996 SSR LEXIS 4, at *21-*22; *Nichols, supra*, 556 F.2d at 933.

First, the Court notes that the ALJ relied on a lack of support for plaintiff's

allegations from the objective medical evidence when making the determination not to

credit fully her allegations of disabling pain and limitations (*see* Tr. 20-21). The Court

concludes that the ALJ's reliance on the lack of objective medical evidence was proper.

As discussed previously, *see supra*, section 1.a, it was plaintiff's examining

rheumatological specialist who opined that there was an "absence of significant objective

findings" to substantiate plaintiff's allegations (*see* Tr. 382). The Court concludes that the

ALJ did not err in crediting this medical opinion. Although plaintiff is correct that an ALJ

cannot rely solely on objective medical evidence when making a determination regarding

a claimant's credibility, the ALJ here also relied on plaintiff's failure to follow prescribed

treatment (*see* Tr. 20-21). The ALJ found in relevant part that plaintiff "stopped taking

antidepressants even though they were helping her" (*see* Tr. 20 (*citing* Exhibit 12F)).

As discussed previously, on January 10, 2001, plaintiff indicated to her treating

doctor, Dr. Kato, that she was feeling very tired and fatigued since she started taking

Prozac, however, she also indicated that it was working well for her depression (*see* Tr.

462). Dr. Kato indicated that she would have plaintiff take her Prozac in the evening,

instead of in the morning, and Dr. Kato diagnosed plaintiff with "Depression well

controlled with Prozac however symptomatic" (*see id.*). One week later, Dr. Kato's notes

reveal that plaintiff "has stopped the Prozac" (*see* Tr. 463). Dr. Kato's notes do not

indicate that plaintiff was suffering any depression at that time, in fact, she indicated that

1  plaintiff was "actually feeling much better today" (*see id.*). Dr. Kato did not assess that

2  plaintiff was suffering from depression at this January 17, 2001 examination (*see id.*).

3  She indicated that she reviewed plaintiff's medications with her and would not make any

4  changes (*see id.*).

5       Here, plaintiff complains that although the record indicates that Dr. Kato opined

6  that Prozac effectively controlled plaintiff's depression, the ALJ erred in reliance on this

7  fact because the ALJ failed to mention that this treatment note of Dr. Kato also indicated

8  that plaintiff was suffering from side effects, particularly fatigue (*see* Opening Brief, ECF

9  No. 12, p. 16).

10      The Court finds that the ALJ's finding that Prozac controlled plaintiff's depression

11  is supported by Dr. Kato's diagnosis prior to the alleged date of disability of "Depression

12  well controlled with Prozac however symptomatic" (*see* Tr. 462), as well as being

13  supported by plaintiff's statement during the alleged disability period, in December,

14  2002, that Prozac had worked well a long time ago (*see* Tr. 491). Although plaintiff had

15  indicated prior to her date last insured that she suffered fatigue after starting Prozac, Dr.

16  Kato indicated that she was changing the time of taking the prescription from the

17  morning to the evening, to alleviate the fatigue (*see* Tr. 462). Shortly thereafter, plaintiff

18  stopped taking Prozac on her own, indicated that she was "actually feeling much better

19  today," and was not assessed with depression (*see* Tr. 463).

20

21      Similarly, during the alleged period of disability, on September 13, 2002, plaintiff

22  indicated that she was "doing better on the Zoloft" (*see* Tr. 486). Supporting plaintiff's

23  September, 2002 assessment of doing better on Zoloft, on October 28, 2002, Dr. Kato did

24

not diagnose plaintiff with depression (*see* Tr. 490). On December 11, 2002, plaintiff reported that she ceased her Zoloft for a couple of days on her own (*see* Tr. 491).

After plaintiff's Prozac was restarted on December 11, 2002 (*see id.*), at plaintiff's December 27, 2002 follow up appointment, depression was not discussed and was not diagnosed as a current impairment (*see* Tr. 494). Prozac is listed as a current medication in January, 2003, and depression still is not diagnosed as an impairment in January, 2003, just after plaintiff's date last insured (*see* Tr. 495).

The ALJ's discussion of the control of plaintiff's depression with medication is not extremely thorough and the time line could be more accurate. However, for the reasons discussed, and based on the relevant record, the Court concludes that the ALJ's finding that plaintiff "stopped taking antidepressants even though they were helping her" is supported by substantial evidence in the record as a whole (*see* Tr. 20 (*citing* Exhibit 12F)).

In addition, although the ALJ did not discuss plaintiff's complaints prior to her date last insured of side effects from Prozac, the evidence demonstrates that plaintiff was taking Prozac starting in December, 2002, and that she was assessed numerous times thereafter as presenting with normal mood and affect, and without complaints of side effects *see supra*, section 1.c. For example, depression is not diagnosed as an impairment in January, 2003, just after plaintiff's date last insured (*see* Tr. 495). The Court also notes that the record indicates that plaintiff was taking Prozac into the next year and the record does not appear to contain complaints of side effects from her Prozac in December, 2002; January, 2003; or thereafter (*see* Tr. 491, 494, 195-97, 499-501, 506-07).

For the stated reasons, and based on a review of the relevant record as a whole, the Court concludes that the ALJ provided clear and convincing reasons for her failure to credit fully plaintiff's testimony and allegations. *See Smolen, supra*, 80 F.3d at 1283-84; *Reddick, supra*, 157 F.3d at 722.

3.   **Whether or not the ALJ erred in her review of plaintiff's residual functional capacity ("RFC")**.

If the ALJ cannot determine whether or not a claimant is disabled based on a claimant's current work activity or on medical factors alone and a claimant has a severe impairment, a review is made of the claimant's residual functional capacity ("RFC"). *See* Social Security Ruling "SSR" 96-8p, 1996 SSR LEXIS 5 at *3-*4. A determination regarding "residual functional capacity 'is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Brown v. Astrue*, 405 Fed. Appx. 230, 233, 2010 U.S. App. LEXIS 26760 at **6 (9th Cir. 2010) (per curiam) (unpublished opinion) (*quoting id.* at *5) (*citing* 20 C.F.R. § 416.945; *Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998)). Residual functional capacity is "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs."  20 C.F.R. § 404, Subpart P, App. 2 § 200.00(c).

Here, plaintiff complains that the ALJ erred in evaluation her RFC, however, plaintiff has not demonstrated that any further specific limitations should have been included in her RFC (*see* Opening Brief, ECF No. 12, pp. 21-22). For example, plaintiff

1   complains that the ALJ failed to include all of the limitations described by Drs. Layton

2   and Kato, but does not specify a single limitation opined by either of plaintiff's doctors

3   that should have been included that is not in her RFC (*see id.*). In addition, although

4   plaintiff contends that the ALJ erred in not crediting her allegation that she was required

5   to change positions at will between sitting, standing and walking in order to relieve joint

6   pain and the effects of her depression, headaches, and medication side effects, including

7   fatigue, the ALJ provided clear and convincing reasons for her failure to credit fully

8   allegations by plaintiff regarding the severity of the limitations resulting from her

9   impairments, *see supra*, section 2. Because the Court already has addressed the issues

10  raised by plaintiff with respect to her RFC challenges, and based on the relevant record,

11  the Court concludes that the ALJ's determination of plaintiff's RFC includes findings

12  based on substantial evidence in the record as a whole and is without harmful legal error.

13

14

15      4.   **Whether or not the ALJ erred at step five by relying on an improper RFC**

16          **that did not include all of plaintiff's limitations and by relying on vocational**

17          **expert testimony in conflict with the Dictionary of Occupational Titles**

18          **("DOT").**

19          If the ALJ reaches the final step in the sequential analysis, the burden shifts to the

20  Commissioner to prove that the claimant can perform other work in the national

21  economy, given her age, education, residual functional capacity ("RFC") and past work

22  experience. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also* 20 C.F.R. §§

23  404.1594(f)(8), 416.994(b)(5)(vii).

24

1    The Court already has determined that the ALJ's RFC determination is not tainted

2    by harmful legal error, *see supra*, section 3. Therefore, plaintiff's first argument

3    regarding step five that the ALJ erroneously relied on an improper RFC is not persuasive.

4    However, because the burden shifts to defendant at step five and because the ALJ failed

5    to acknowledge the discrepancy between the testimony from the vocational expert

6    ("VE") regarding jobs that plaintiff potentially could have performed and the Dictionary

7    of Occupational Titles ("DOT") description of the requirements of such jobs, this matter

8    should be reversed and remanded for further consideration.

9    The ALJ relied on the testimony from a vocational expert at step five that an

10   individual with plaintiff's RFC could perform other work in the national economy --

11   specifically, the jobs of small products assembly and small products cleaners and

12   polishers (*see* Tr. 22-23, 67-69). Plaintiff complains that the vocational expert's

13   testimony conflicts with the DOT -- a contention not disputed by defendant. Plaintiff

14   complains that the ALJ's failure to acknowledge the discrepancy and to include findings

15   that address the deviation in her written decision is harmful legal error requiring reversal.

16   For the reasons discussed below, the Court agrees.

17   At the administrative hearing, the vocational expert indicated that small products

18   assembly was indicated as light work in the DOT, which conflicts with plaintiff's RFC

19   stand/walk limitations, but also indicated as follows:

20   
21           However, available research indicates that approximately 50 percent of
            the jobs, and that's a, a conservative estimate, giving the benefit of the
22           doubt to the worker, could be performed at a sedentary level or changing
            positions between sitting and standing with very little lifting, much less
23           than ten pounds, usually only a few once to one or two pounds.
24

(Tr. 68; *see also* Tr. 69).

According to Social Security Ruling 00-4p:

[B]efore relying on VE or VS evidence to support a disability determination or decision, our adjudicators must:

- Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor, and

-Explain in the determination or decision how any conflict that has been identified was resolved.

SSR 00-4p, 2000 SSR LEXIS 8 at *1 (2000).

In this matter, a potential resolution for the conflict between plaintiff's ability to do the identified jobs and the information in the DOT was provided by the vocational expert, however the ALJ failed to explain in the decision how the conflict was resolved. In fact, the ALJ made the erroneous finding that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles" (*see* Tr. 23). In addition, the ALJ did not adopt the vocational expert's testimony.

The Court also notes that according to SSR 00-4p:

Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict. The adjudicator *must* resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00-4p, *supra*, 2000 SSR LEXIS 8 at *5 (emphasis added).

Here, the ALJ did not make a determination that the explanation provided by the VE for the conflict was reasonable, and instead determined that there was no conflict (*see* Tr. 23). Therefore, according to SSR 00-4p, the VE evidence does not automatically "trump" the DOT, and as there is no explanation in the ALJ's decision as to why the VE testimony is reasonable and should take precedence over the DOT, there is not a sufficient basis for the ALJ to rely on the VE testimony at the step five determination that there were other jobs existing in significant numbers in the national economy that plaintiff could have performed. *See* SSR 00-4p, *supra*, 2000 SSR LEXIS 8 at *1, *5.

Although "Social Security Rulings do not have the force of law, [n]evertheless, they constitute Social Security Administration interpretations of the statute it administers and of its own regulations." *See Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989) (*citing Paxton v. Sec. HHS*, 865 F.2d 1352, 1356 (9th Cir. 1988)) (internal citation and footnote omitted). As stated by the Ninth Circuit, "we defer to Social Security Rulings unless they are plainly erroneous or inconsistent with the [Social Security] Act or regulations." *Id.* (*citing Chevron USA, Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-45 (1984); *Paxton, supra*, 865 F.2d at 1356).

It is not plainly erroneous or inconsistent with the Social Security Act to require ALJs to resolve explicitly any conflicts between the DOT and the jobs identified by vocational expert testimony as jobs that can be performed by claimants. The Court also notes that at the final step in the sequential disability evaluation process, defendant "bears the burden of proof at step five, which determines whether or not the claimant is able to

1   perform work available in the national economy." *See Yuckert, supra*, 482 U.S. at 146

2   n.5.

3

4        As the ALJ erred in her step five determination that plaintiff was capable of

5   performing other work, and as this finding led to the ultimate determination that plaintiff

6   was not disabled, the ALJ's error was not harmless.

7

8        For the reasons stated, the Court concludes that defendant did not demonstrate at

9   step five of the disability evaluation process that other jobs existed in the national

10  economy that plaintiff could have performed during the relevant period of time. For this

11  reason, this matter should be reversed and remanded for further consideration.

12                                    CONCLUSION

13

14       Based on the stated reasons, and the relevant record, the undersigned recommends

15  that this matter be **REVERSED** and **REMANDED** pursuant to sentence four of 42

16  U.S.C. § 405(g) to the Commissioner for further consideration.  **JUDGMENT** should be

17  for **PLAINTIFF** and the case should be closed.

18       Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

19  fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R.

20  Civ. P. 6.  Failure to file objections will result in a waiver of those objections for

21  purposes of de novo review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C).

22  //

23

24

1    Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the

2    matter for consideration on June 28, 2013, as noted in the caption.

3        Dated this 6th day of June, 2013.

4

5

6

7    J. Richard Creatura
     United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

REPORT AND RECOMMENDATION ON
PLAINTIFF'S COMPLAINT - 33